Paul D. Clement (DC Bar 433215)
pclement@bancroftpllc.com
H. Christopher Bartolomucci (DC Bar 453423)
cbartolomucci@bancroftpllc.com
Nicholas J. Nelson (DC Bar 1001696)
nnelson@bancroftpllc.com
Michael H. McGinley (DC Bar 1006943)
mmcginley@bancroftpllc.com

BANCROFT PLLC
1919 M Street, N.W.
Suite 470
Washington, D.C.  20036
202-234-0090 (telephone)
202-234-2806 (facsimile)

*Of Counsel:*
Kerry W. Kircher, General Counsel (DC Bar 386816)
Kerry.Kircher@mail.house.gov
William Pittard, Deputy General Counsel (DC Bar 482949)
William.Pittard@mail.house.gov
Christine Davenport, Senior Assistant Counsel (NJ Bar 043682000)
Christine.Davenport@mail.house.gov
Todd B. Tatelman, Assistant Counsel (VA Bar 66008)
Todd.Tatelman@mail.house.gov
Mary Beth Walker, Assistant Counsel (DC Bar 501033)
MaryBeth.Walker@mail.house.gov
Eleni M. Roumel, Assistant Counsel (SC Bar 75763)
Eleni.Roumel@mail.house.gov

OFFICE OF GENERAL COUNSEL,
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
202-225-9700 (telephone)
202-226-1360 (facsimile)

*Counsel for Intervenor-Defendant the Bipartisan
Legal Advisory Group of the U.S. House of Representatives*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Western Division

|  |  |
|---|---|
| | No. 2:12-cv-00887-CBM (AJWx) |
| TRACEY COOPER-HARRIS and MAGGIE COOPER-HARRIS, | |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS MOTION OF INTERVENOR-DEFENDANT FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants, | |
| BIPARTISAN LEGAL ADVISORY GROUP OF THE U.S. HOUSE OF REPRESENTATIVES, | Hearing: May 6, 2013<br>Time:  11:00 a.m.<br>Hon. Consuelo B. Marshall |
| Intervenor-Defendant. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ...........................................................................................1

STATEMENT OF THE ISSUE TO BE DECIDED...................................................1

PROCEDURAL HISTORY....................................................................................1

BACKGROUND ...............................................................................................2

SUMMARY JUDGMENT STANDARD ................................................................2

ARGUMENT ...................................................................................................4

    I. Congressional Enactments Are Entitled to a Strong Presumption of Constitutionality. ...........................................................................4

    II. Supreme Court Precedent and Ninth Circuit Precedent Directly Control the Outcome in This Case:  Traditional Marriage Provisions Do Not Violate Equal Protection Principles. ...........................................................5

    III. Supreme Court Precedent and Ninth Circuit Precedent Require the Application of Rational Basis Review to Plaintiffs' Equal Protection Challenge to DOMA Section 3 and Section 101.........................................5

    IV. Traditional Marriage Provisions Easily Satisfy Rational Basis Review........5

    A. Uniquely Federal Interests........................................................7

        1. Maintaining a Uniform Federal Definition of Marriage ......................8

        2. Preserving the Public Fisc and Previous Legislative Judgments .........11

        3. Caution in Facing the Unknown Consequences of a Novel Redefinition of a Foundational Social Institution .........................13

    B. Common Federal-State Interests:  Congress Rationally Sought to Encourage Responsible Procreation...................................................16

        1. Traditional Marriage Provisions Rationally Focus on Opposite-Sex Couples in Subsidizing the Begetting and Raising of Children. ...17

i

2. Traditional Marriage Provisions Rationally Encourage and Subsidize the Raising of Children by Their Own Biological Mothers and Fathers. ........................................................................19

3. Traditional Marriage Provisions Rationally Encourage Childrearing in a Setting with Both a Mother and Father. ..................................21

4. Allegations of "Animus" Cannot Invalidate Traditional Marriage Provisions. ........................................................................21

V. The Democratic Process Should Be Used to Redefine Marriage..................22

CONCLUSION ........................................................................23

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Howerton*,
    673 F.2d 1036 (9th Cir. 1982) .......................................................................5

*Andersen v. King Cnty.*,
    138 P.3d 963, 158 Wash. 2d 1 (Wash. 2006) ...............................................17

*Ass'n of Residential Res. in Minn., Inc. v. Gomez*,
    51 F.3d 137 (8th Cir. 1995) .......................................................................12

*Aufort v. Aufort*,
    49 P.2d 620, 9 Cal. App. 2d 310 (Cal. Dist. Ct. App. 1935).........................17

*Baehr v. Lewin*,
    852 P.2d 44, 74 Haw. 645 (Haw. 1993) ........................................................9

*Baker v. Nelson*,
    409 U.S. 810, 93 S. Ct. 37, 34 L. Ed. 2d 65 (1972) ......................................5

*Ballard v. United States*,
    329 U.S. 187, 67 S. Ct. 261, 91 L. Ed. 181 (1946) ......................................21

*Bowen v. Owens*,
    476 U.S. 340, 106 S. Ct. 1881, 90 L. Ed. 2d 316 (1986) ......................12, 13

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
    818 F.2d 1466 (9th Cir. 1987) .......................................................................3

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...............................3

*Citizens for Equal Prot. v. Bruning*,
    455 F.3d 859 (8th Cir. 2006) .......................................................................17

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) .............................21

*City of Dallas v. Stanglin*,
    490 U.S. 19, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989) .................................5

*Conaway v. Deane*,
    932 A.2d 571, 401 Md. 219 (Md. 2007) ......................................................17

*Craig v. Boren*,
    429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) .................................20

*Dailey v. Veneman*,
    No. 01-3146, 2002 WL 31780191 (6th Cir. Dec. 3, 2002) ...........................10

*Dandridge v. Williams*,
　　397 U.S. 471, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970) ...............................12

*FCC v. Beach Commc'ns, Inc.*,
　　508 U.S. 307, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993) .........................4, 6

*Hassan v. Wright*,
　　45 F.3d 1063 (7th Cir. 1995) ......................................................................12

*Heller v. Doe*,
　　509 U.S. 312, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) .........................4, 6

*Hernandez v. Robles*,
　　855 N.E.2d 1, 821 N.Y.S.2d 770 (N.Y. 2006) .....................................16, 20

*In re Cardelucci*,
　　285 F.3d 1231 (9th Cir. 2002) ......................................................................8

*Johnson v. Robison*,
　　415 U.S. 361, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974) ...............................6

*Lawrence v. Texas*,
　　539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) ..........................15

*Marsh v. Chambers*,
　　463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983) ..........................15

*Massachusetts v. Dep't of HHS*,
　　682 F.3d 1 (1st Cir. 2012).......................................................................8, 11

*Matthews v. Decastro*,
　　429 U.S. 181, 197 S. Ct. 431, 50 L. Ed. 2d 389 (1976) ................................5

*Mullins v. Oregon*,
　　57 F.3d 789 (9th Cir. 1995) ........................................................................19

*New State Ice Co. v. Liebmann*,
　　285 U.S. 262, 52 S. Ct. 371, 76 L. Ed. 747 (1932) .....................................14

*Nunez-Reyes v. Holder*,
　　602 F.3d 1102 (9th Cir. 2010) ....................................................................10

*Nunez-Reyes v. Holder*,
　　646 F.3d 684 (9th Cir. 2011) ......................................................................10

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
　　557 U.S. 193, 129 S. Ct. 2504, 174 L. Ed. 2d 140 (2009) .............................4

*Perry v. Brown*,
　　671 F.3d 1052 (9th Cir. 2012) ......................................................................3

*Plyler v. Doe*,
　　457 U.S. 202, 227, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) .....................12

iv

*Price v. Heckler,*
    733 F.2d 699 (9th Cir. 1984) ............................................................5

*Regan v. Taxation With Representation of Wash.,*
    461 U.S. 540, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983) ..............7

*Regan v. Time, Inc.,*
    468 U.S. 641, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1984) ..............4

*Rinaldi v. Yeager,*
    384 U.S. 305, 86 S. Ct. 1497, 16 L. Ed. 2d 577 (1966) ...............13

*Romer v. Evans,*
    517 U.S. 620, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996) ...........21, 22

*Rostker v. Goldberg,*
    453 U.S. 57, 101 S. Ct. 2646, 69 L. Ed. 2d 478 (1981) ................4

*Santosky v. Kramer,*
    455 U.S. 745, 766, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) ......19

*Schweiker v. Wilson,*
    450 U.S. 221, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981) ..............6

*Smelt v. Cnty. of Orange,*
    447 F.3d 673 (9th Cir. 2006) ..........................................................22

*Stanley v. Illinois,*
    405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) ...............19

*Tigner v. Texas,*
    310 U.S. 141, 60 S. Ct. 879, 84 L. Ed. 1124 (1940) .....................6

*Tuan Anh Nguyen v. INS,*
    533 U.S. 53, 121 S. Ct. 2053, 150 L. Ed. 2d 115 (2001) .............19

*United States v. Five Gambling Devices,*
    346 U.S. 441, 74 S. Ct. 190, 98 L. Ed. 179 (1953) ......................4

*United States v. O'Brien,*
    391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968) ...............21

*United States v. Virginia,*
    518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) ...........21

*USDA v. Moreno,*
    413 U.S. 528, 93 S. Ct. 2871, 37 L. Ed. 2d 782 (1973) ...............21

*Vance v. Bradley,*
    440 U.S. 93, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979) ...................6

*Vill. of Belle Terre v. Boraas,*
    416 U.S. 1, 94 S. Ct. 1536, 39 L. Ed. 2d 797 (1974) ...................7

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    473 U.S. 305, 105 S. Ct. 3180, 87 L. Ed. 2d 220 (1985) ................................4

*Washington v. Glucksberg*,
    521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) ............................22


**Statutes and Federal Rules**

1 U.S.C. § 7 ................................................................................................................1

38 U.S.C. § 101 ..........................................................................................................1

38 U.S.C. § 103 ..........................................................................................................8

Veterans' Judicial Review Act, Pub. L. No. 100-687, 102 Stat. 4105 (1988) ..........2

Fed. R. Civ. P. 56 .......................................................................................................3


**Federal Regulations**

38 C.F.R. § 3.1 ..........................................................................................................8


**State Constitutional Provisions**

Fla. Const. art. I, § 27 ................................................................................................9


**Legislative Authorities**

142 Cong. Rec. ..........................................................................................................8

150 Cong. Rec. ..............................................................................................8, 13, 14

152 Cong. Rec. ....................................................................................................10, 14

Fed. R. Evid. 201 advisory committee's note ............................................................3

H. Rep. No. 104-664 (1996) ....................................................................................11

H. Rep. No. 94-601 (1975) ......................................................................................13


**Other Authorities**

1 William Blackstone, Commentaries on the Laws of England ...............................17

Adam P. Romero et al., *Census Snapshot*, The Williams Institute (Dec. 2007),
    http://escholarship.org/uc/item/6nx232r4 ..........................................................18

Daphne Lofquist et al., *Housholds and Families: 2010*, Census Br. C2010BR-14, (Apr. 2012), *available at* http://www.census.gov/prod/cen2010/briefs/c2010br-14.pdf ......................18

Douglas Holtz-Eakin, Cong. Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* (2004), *available at* http://www.cbo.gov/ftpdocs/55xx/doc5559/06-21-SameSexMarriage.pdf. .11

Institute for American Values, *Marriage and the Law: A Statement of Principles* (2006) ..............................................................................17

*Joslin v. New Zealand*, No. 902/1999 H.R. Comm. 2002, *in* 2 Report of the Human Rights Comm., U.N. Doc. A/57/40 (2002)......................................17

*Living Arrangements of Children Under 18 Years Old: 1960 to Present*, U.S. Census Bureau, *available at* http://www.census.gov/hhes/families/data/children.html ...........................18

N.M. Att'y Gen. Op. No. 11-01, 2011 WL 111243 (Jan. 4, 2011) ..........................8

Re: Recognition in New Jersey of Same-Sex Marriages, Civil Unions, Domestic Partnerships and Other Government-Sanctioned, Same-Sex Relationships Established Pursuant to the Laws of Other States and Foreign Nations, N.J. Att'y Gen. Op. No. 3-2007, 2007 WL 749807 (Feb. 16, 2007)..............................................................................8

*Schalk & Kopf v. Austria*, No. 30141/04 E.U. Ct. H. R. 2010, *available at* http://archive.equal-jus.eu/109/1/Schalk_and_Kopf.pdf...........17

United Nations Convention on the Rights of the Child, 28 I.L.M. 1456 (Nov. 20, 1989) ...................................................................19

William Meezan & Jonathan Rauch, *Gay Marriage, Same-Sex Parenting, and America's Children*, 15 Future of Children 97, 110 (Fall 2005), http://futureofchildren.org/futureofchildren/publications/ docs/15_02_06.pdf................................................................14, 20

vii

# INTRODUCTION

This lawsuit challenges on equal protection grounds two federal statutes: Section 3 of the Defense of Marriage Act, 1 U.S.C. § 7 ("DOMA Section 3") ("In determining the meaning of any Act of Congress, . . . the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife.") and Section 101(31) of Title 38 of the United States Code ("Section 101") ("For the purposes of this title . . . [t]he term 'spouse' means a person of the opposite sex who is a wife or husband.").[1]

Supreme Court precedent and Ninth Circuit precedent establish that DOMA Section 3 and Section 101 neither burden a fundamental right nor employ a suspect classification, and therefore need only pass rational basis review.  And they do, easily.  After all, myriad rational bases – some uniquely federal; some analogous to the bases that underlie state provisions defining marriage in the traditional manner – support the constitutionality of both DOMA Section 3 and Section 101. Accordingly, judgment should be entered in favor of the House and against Plaintiffs on their DOMA Section 3 and Section 101 claims.

## STATEMENT OF ISSUE TO BE DECIDED

Whether DOMA Section 3 and Section 101 comport with the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

## PROCEDURAL HISTORY

On April 2, 2012, the Bipartisan Legal Advisory Group of the United States House of Representatives (the "House")  moved to intervene in this case after the Executive Branch defendants, through the Department of Justice (the

---

[1]  Section 101 thus defines "marriage," for the purposes of eligibility for certain veterans' benefits, in exactly the way as DOMA does for all of federal law.  The two therefore are constitutional for the same reasons, and references to DOMA Section 3 herein refer also to Section 101, and vice versa, unless otherwise indicated.

1

"Department"), declined to defend DOMA Section 3 against equal protection challenges.  Notice of Unopposed Mot. & Unopposed Mot. of [House] for Leave to Intervene (Apr. 2, 2012) (ECF No. 17).  On May 22, 2012, this Court granted the House's motion.  Order (ECF No. 38).  The House understands, however, that the Department will continue to defend against non-equal protection challenges.[2]

Plaintiffs moved for summary judgment.  *See* Pls.' Notice of Mot. & Mot. for Summ. J. (Mar. 4, 2013) (ECF No. 96); Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. (Mar. 4, 2013) (ECF No. 97) ("Plaintiffs' Memorandum").  The House now cross-moves for summary judgment (and opposes Plaintiffs' motion).

## BACKGROUND

Section 3 of DOMA provides that for purposes of federal law, "'marriage'… means only a legal union between one man and one woman."  Consonantly, Section 101 provides that for purposes of veterans' benefits, a "spouse" is "a person of the opposite sex who is a husband or wife."  These statutes thus provide federal marital benefits to, and impose federal marital regulations on, opposite-sex couples, but not same-sex couples such as the Plaintiffs here.  Plaintiffs have challenged the constitutionality of these provisions under the equal-protection component of the Fifth Amendment's Due Process Clause.  The backgrounds of these two statutes and of this case are set forth in the House's contemporaneously filed Opposition to Plaintiffs' Motion for Summary Judgment at 3-8 (Mar. 18, 2013) ("House Opposition"), expressly incorporated here.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no

---

[2]  The Department is defending Section 101 against Plaintiffs' claims on the basis that those claims are not properly before this court.  *See* Fed. Defs.' Mem. of P. & A. in Supp. of Their Mot. to Dismiss for Lack of Subject Matter Jurisdiction at 1-4 (Dec. 13, 2012) (ECF No. 68-1) ("This Court's review of Plaintiffs' equal protection challenge is barred by the Veterans' Judicial Review Act, Pub. L. No. 100-687, 102 Stat. 4105 (1988), which provides an exclusive review scheme for veterans to pursue benefits claims, including raising constitutional challenges to statutes and regulations that govern [Department of Veterans Affairs] benefits.")

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]f the nonmoving party will bear the burden of proof at trial as to an element essential to its case" – as Plaintiffs would here as to whether any rational basis supports DOMA Section 3, *see infra* pp. 4-5 – "and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

The rule requiring the absence of a genuine issue of fact to support summary judgment, however, applies only to the adjudicative facts that otherwise would be tried to a jury. *See* Fed. R. Evid. 201 advisory committee's note (rules of evidence and procedure apply to adjudicative but not legislative facts). In granting or denying summary judgment, this Court itself may consider and make determinations as to legislative facts. *See id.*

> Adjudicative facts are facts about the parties and their activities, usually answering the questions of who did what, where, when, how, why, with what motive or intent . . . . Legislative facts, by contrast, do not usually concern only the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion.

*Perry v. Brown*, 671 F.3d 1052, 1075 (9th Cir. 2012) (quotation marks, citations, brackets, & ellipses omitted).

This is particularly the case where, as here, the question presented to this Court includes whether DOMA Section 3 and Section 101 satisfy rational basis review, which requires consideration only of whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification."

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993), and under which the party defending the classification has no obligation to submit any evidence in support of any such rational basis, *see Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993).  Thus, a statute passes muster under rational basis review if it has a *plausible* justification.  So long as there are reasonably conceivable arguments on both sides of the question, it is for Congress and not the courts to choose between them, and statutes like DOMA Section 3 and Section 101 must be upheld.

## ARGUMENT

## I.   Congressional Enactments Are Entitled to a Strong Presumption of Constitutionality.

Duly enacted federal laws are entitled to a strong presumption of constitutionality.  "[J]udging the constitutionality of an Act of Congress is the gravest and most delicate duty that th[e] Court[s] [are] called on to perform." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204, 129 S. Ct. 2504, 174 L. Ed. 2d 140 (2009) (quotation marks omitted).  "The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States." *Id.* at 205 (quotation marks omitted).  Because "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people," *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1984), the "Court[s] do[] and should accord a strong presumption of constitutionality to Acts of Congress.  This is not a mere polite gesture.  It is a deference due to deliberate judgment by constitutional majorities of the two Houses of Congress that an Act is [constitutional]." *United States v. Five Gambling Devices*, 346 U.S. 441, 449, 74 S. Ct. 190, 98 L. Ed. 179 (1953) (plurality).  This deference "is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality," *Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S. Ct. 2646, 69 L. Ed. 2d 478 (1981); *see* House Opp'n at 6 & n.6, and "must be afforded even though the claim is that a statute" violates the Fifth Amendment, *Walters v. Nat'l Ass'n of*

4

*Radiation Survivors*, 473 U.S. 305, 319-20, 105 S. Ct. 3180, 87 L. Ed. 2d 220 (1985). Moreover, as this Court has noted, there is a "'strong presumption of constitutionality to legislation conferring monetary benefits.'" *Price v. Heckler*, 733 F.2d 699, 701 (9th Cir. 1984) (citing *Matthews v. Decastro*, 429 U.S. 181, 185, 197 S. Ct. 431, 50 L. Ed. 2d 389 (1976).

**II.  Supreme Court Precedent and Ninth Circuit Precedent Directly Control the Outcome in This Case:  Traditional Marriage Provisions Do Not Violate Equal Protection Principles.**

The Supreme Court, in *Baker v. Nelson,* 409 U.S. 810, 93 S. Ct. 37, 34 L. Ed. 2d 65 (1972), and the Ninth Circuit, in *Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982), each already has held that traditional marriage provisions do not violate equal protection principles, thereby foreclosing Plaintiffs' equal protection claims (at least until the Supreme Court and en banc Ninth Circuit reevaluate those holdings). The House Opposition discusses *Baker* and *Adams*, and why they control in this case, on pages 12-17, which are expressly incorporated here.[3]

**III.  Supreme Court Precedent and Ninth Circuit Precedent Require the Application of Rational Basis Review to Plaintiffs' Equal Protection Challenge to DOMA Section 3 and Section 101.**

For the reasons set forth in the House's Opposition at 17-20, expressly incorporated here, Plaintiffs cannot, in light of binding Supreme Court and Ninth Circuit authority escape the application of rational basis review to their equal protection claims.

**IV.  Traditional Marriage Provisions Easily Satisfy Rational Basis Review.**

Rational basis review "is the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v. Stanglin*, 490 U.S. 19, 26, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989). Under such review, a statute receives "a strong presumption of validity" and must be upheld "if there is any reasonably

---

[3] For the reasons set forth in the House's Opposition at 20-22, expressly incorporated here, neither DOMA Section 3 nor Section 101 classifies on the basis of gender.

conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 313-14.

"[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker." *Vance v. Bradley*, 440 U.S. 93, 111, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification," and "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 320. "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315. Indeed, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* "[T]he burden is on the one attacking the legislative arrangement to negative *every conceivable basis* which might support it, whether or not that basis has a foundation in the record." *Heller*, 509 U.S. at 320-21 (quotation marks and citations omitted, emphasis added). Furthermore, the courts may not "substitute [their] personal notions of good public policy for those of Congress." *Schweiker v. Wilson*, 450 U.S. 221, 234, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981).

In an equal protection challenge, a classification is rational if "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not." *Johnson v. Robison*, 415 U.S. 361, 383, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974); *see Tigner v. Texas*, 310 U.S. 141, 147, 60 S. Ct. 879, 84 L. Ed. 1124 (1940) ("The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same."). The question is not whether the denial of certain benefits to relationships other than opposite-sex couples serves any particular government interest when considered in

a vacuum – nor, as Plaintiffs seem to assume, whether that denial by itself will encourage opposite-sex couples to marry or have children. *See* Pls.' Mem. at 18-19. Rather, the question is whether any rational reason exists for extending such benefits to opposite-sex couples that does not apply in the same way, or to the same degree, with respect to same-sex couples. If Congress could not rationally offer a benefit to one class of people but not to others unless the *denial* itself confers some *additional* benefit on the first class, then a vast host of government benefits would have to be either extended to virtually everyone, or else eliminated.[4] That is not the case. Instead, as the Supreme Court has long recognized, when government defines who or what constitutes a family, it is engaged in the sort of process where "every line drawn . . . leaves some out that might well have been included," and "[t]hat exercise of discretion . . . is a legislative, not a judicial, function." *Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S. Ct. 1536, 39 L. Ed. 2d 797 (1974).

### A.     Uniquely Federal Interests.

In defining marriage for purposes of federal law, Congress could and did consider the interests that motivate the states' traditional definitions of marriage. *See infra* pp. 16-22. But Congress also was motivated by several interests peculiar to the federal government, including: (1) creating uniformity in federal marital status across state lines, (2) protecting the public fisc and preserving the judgments of previous Congresses, and (3) exercising caution in considering the unknown but surely significant effects of an unprecedented change in a fundamental social institution (and thus preserving the authority of the United States, as a separate sovereign, to enact its own definition of marriage for purposes of its own laws). *See*

---

[4] For instance, in *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550-51, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983), the Supreme Court held that it was "not irrational for Congress to decide that, even though it will not subsidize substantial lobbying by charities generally, it will subsidize lobbying by veterans' organizations," despite the fact that offering a tax benefit to other charities would have little if any effect on the benefit to veterans' groups.

*Massachusetts v. Dep't of HHS*, 682 F.3d 1, 12 (1st Cir. 2012) ("Congress surely has an interest in who counts as married.  The statutes and programs that [DOMA] governs are federal regimes . . . .").

### 1.    Maintaining a Uniform Federal Definition of Marriage.

DOMA Section 3 and Section 101 manifestly serve the federal interest in uniform eligibility for federal benefits – that is, in ensuring that similarly-situated couples will be eligible for the same federal marital status regardless of in which state they happen to live.  *See, e.g.*, 142 Cong. Rec. 10468 (1996) (Sen. Nickles) (DOMA "will eliminate legal uncertainty concerning Federal benefits"); *id.* 22459 (Sen. Ashcroft) (finding it "very important" to prevent "people in different States [from having] different eligibility to receive Federal benefits"); *see also* 150 Cong. Rec. 15318 (2004) (Sen. Inhofe) (issue "should be handled on a Federal level [because] people constantly travel and relocate across State lines throughout the Nation").  Congress has "legitimate interests in efficiency, fairness, predictability, and uniformity" in federal programs.  *In re Cardelucci*, 285 F.3d 1231, 1236 (9th Cir. 2002).

As to Section 101, it assures uniform treatment of same-sex couples in the veterans' benefits context, no matter whether those couples happen to reside in a state that permits or recognizes same-sex marriage.  Absent Section 101, and later DOMA Section 3, veterans' marriage benefits would turn on the validity of particular marriages under "the law of the place where the parties resided at the time of the marriage or the law of the place where the parties resided when the right to benefits accrued," 38 U.S.C. § 103(c); 38 C.F.R. § 3.1(j) – determinations that not only are difficult (and changing),[5] but which certainly would result in

---

[5]  For example, determining the "place where the parties resided" is particularly difficult with military couples, as are the legal questions involved in determining the time at which a particular benefit "accrued" and whether any parties' states (of residence) recognized same-sex marriage at that particular time.  *Compare* N.M. Att'y Gen. Op. No. 11-01, 2011 WL 111243 (Jan. 4, 2011) (predicting that New Mexico would recognize out-of-state same-sex marriages despite not issuing its own licenses to same-sex couples), *with, e.g.*, Re: Recognition (in New

*(Continued . . .)*

8

widely disparate treatment of same-sex couples.  The logical outgrowth of Plaintiffs' position would thus result in the arbitrary provision of dependent spouse benefits only to those same-sex couples who happen to "reside[]" in a state that recognizes same-sex marriage at the time they are married or at the time the rights to benefits accrue.  It is certainly rational to prefer a regime that treats same-sex couples uniformly.

The Hawaii Supreme Court's decision in *Baehr v. Lewin*, 852 P.2d 44, 74 Haw. 645 (Haw. 1993), brought this uniformity issue to the fore, *see* House Opp'n at 5.  More particularly, that decision presented Congress with three choices with respect to the substantive eligibility criteria for federal marital benefits:  Congress could have (a) adopted the approach of the overwhelming majority of the states and limited marriage to opposite-sex couples for purposes of federal law, (b) incorporated a patchwork of state rules into federal law, meaning that federal benefits for same-sex couples would depend on which state the couple lived in at a particular time, or (c) flouted the majority state approach and recognized same-sex marriage nationwide for federal purposes.  Any of these choices would have been rational – including (a), the one that Congress opted for by enacting DOMA.

Plainly, Congress legitimately could conclude that a uniform nationwide definition was desirable, and thus reject option (b).  As noted immediately above with respect to Section 101, it was more than rational for Congress to avoid treating same-sex couples differently for purposes of federal law based on their state of residence.  Substantial confusion would have arisen regarding same-sex couples who married in a state or country that permitted it, but resided in a state

---

Jersey of Same-Sex Marriages, Civil Unions, Domestic Partnerships and Other Government-Sanctioned, Same-Sex Relationships Established Pursuant to the Laws of Other States and Foreign Nations, N.J. Att'y Gen. Op. No. 3-2007, 2007 WL 749807 (Feb. 16, 2007) (foreign same-sex marriages recognized as civil unions), *and with, e.g.*, Fla. Const. art. I, § 27 (declining recognition).

that does not recognize foreign same-sex marriages:[6]  Congress would have been forced either to recognize such marriages, in conflict with the couple's own state government, or else to have been willing to wipe out a previously federally-recognized marriage if the couple moved to a non-recognition state.  Congress also rationally declined option (c), which would have ensured uniformity by treating all same-sex couples as married for federal law purposes, contrary to the laws of the vast majority of states.  Rather than treat same-sex couples differently based on the happenstance of where they reside or override the approach of the vast majority of states, Congress rationally chose to preserve uniformity by adopting the rule of the vast majority of states as its own.  *See Nunez-Reyes v. Holder*, 646 F.3d 684, 690 (9th Cir. 2011) (en banc) (where some states confer certain status and others do not, it is rational for Congress, "rather than adopt a piecemeal approach," and "in the strong interest of uniformity," not to recognize state-law status for federal law purposes) (quoting *Nunez-Reyes v. Holder*, 602 F.3d 1102, 1107 (9th Cir. 2010) (Graber, J., concurring)); *Dailey v. Veneman*, No. 01-3146, 2002 WL 31780191, at *3 (6th Cir. Dec. 3, 2002) (describing "Congress's interest in uniformity" as rational basis and noting as to program at issue that "Congress may have wanted to avoid confusion by establishing a uniform standard").

To the extent that previous Congresses decided not to pursue national uniformity – often with respect to far less common and far less controversial disagreements among the states – this cannot and does not make it irrational for a later Congress to choose to pursue this legitimate federal interest.  In the context of nationwide programs such as veterans' benefits, it surely is rational to treat two same-sex couples in different states the same, rather than offering one distinct benefits based on differences in state marriage law.  Moreover, avoiding difficult,

---

[6]  *E.g.*, 152 Cong. Rec. 10067 (2006) (Sen. Carper) (if a Delaware same-sex couple "go[es] to another country or another place where same-sex marriages are allowed . . . they are not married in my State").

and therefore administratively burdensome, choice of law questions that could arise if federal benefits turned on state law recognition of out-of-jurisdiction marriages is a sufficient basis to support DOMA Section 3 and Section 101.

### 2. Preserving the Public Fisc and Previous Legislative Judgments.

By maintaining the traditional definition of marriage in DOMA Section 3 and Section 101, Congress preserved both the public fisc and the legislative judgments of countless earlier Congresses, which used terms like "marriage" and "spouse" on the understanding that the programs they created conferred benefits or imposed duties solely for those in traditional marriages. *See* H. Rep. No. 104-664, at 18 (1996) ("House Report"); House Opp'n at 5, 8.

Section 101 applies solely to the provision of veterans' benefits, and thus, Congress rationally could have assumed that a narrower definition of marriage would preserve the federal fisc. Although DOMA Section 3 applies to federal marital burdens as well as benefits, on balance, Congress likewise reasonably could have concluded that a more restricted definition of marriage would preserve the federal fisc. *See Massachusetts*, 682 F.3d at 14 (Congress's decision based on preserving scarce government resources "may well be true, or at least might have been thought true"). Congress expressly relied on this cost-saving rationale in enacting DOMA. House Rep. at 18; *see* House Opp'n at 5-6.[7] Indeed, Congress's

---

[7] Plaintiffs note that in 2004 the Congressional Budget Office (the "CBO") opined that treating same-sex couples as married under federal law would result in so many of them becoming ineligible for federal means-tested benefits (after the incomes of their same-sex partners were included) that it would result in a net benefit to the Treasury, even after consideration of the resultant tax revenue decrease. *See* Pls.' Mem. at 20 (citing Douglas Holtz-Eakin, Cong. Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* (2004), *available at* http://www.cbo.gov/ftpdocs/55xx/doc5559/06-21-SameSexMarriage.pdf). This report assumes that same-sex couples who would suffer a net reduction in federal benefits nonetheless would marry at the same rate as couples receiving a net benefit from marriage. That is a critical but highly dubious assumption. If same-sex couples who stand to benefit get married more frequently than those who stand to lose federal benefits by virtue of being married, then Congress's concern about the impact on the federal fisc would be fully justified. In the absence of any hard data in 1996 (or 2004) about this dynamic, Congress

(*Continued . . .*)

11

realization that recognizing same-sex marriage for federal purposes would have a large and unpredictable effect on the budgets of various federal agencies – benefitting some agency budgets and substantially burdening others – would be a rational reason to avoid such budgetary turmoil even were there some question whether the overall net effect would be positive or negative.  It was perfectly rational for Congress to avoid that uncertainty by maintaining the traditional definition.

Plaintiffs suggest that saving money is not a rational basis for a law unless there is some further explanation for *how* the money is saved.  *See* Pls.' Mem. at 20-21.  But in statutes apportioning benefits, saving money by declining to expand pre-existing eligibility requirements or avoiding massive fiscal uncertainty are themselves rational bases.  *See*, *e.g.*, *Bowen v. Owens*, 476 U.S. 340, 347-48, 106 S. Ct. 1881, 90 L. Ed. 2d 316 (1986); *Dandridge v. Williams*, 397 U.S. 471, 487, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970) ("The Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients."); *Ass'n of Residential Res. in Minn., Inc. v. Gomez*, 51 F.3d 137, 141 (8th Cir. 1995) ("Preserving the fiscal integrity of welfare programs is a legitimate state interest."); *Hassan v. Wright*, 45 F.3d 1063, 1069 (7th Cir. 1995) ("[P]rotecting the fisc provides a rational basis for Congress's line drawing in this instance.").  To be sure, when government *withdraws* benefits that it previously offered to a class of people, or affirmatively penalizes a class of people or imposes extra financial obligations on them, saving money (or in the latter case, obtaining money) alone may not justify the deprivation.  *See Plyler v. Doe*, 457 U.S. 202, 205, 227, 102 S.

---

rationally could have concluded that the net effect would be negative.  More broadly, the CBO report is little more than nine pages in length, lacks detailed analysis, and its estimate – and that is all it is – that being married would constitute a net financial *detriment* to same-sex couples as a class is implausible enough that Congress rationally could have rejected it even had it existed in 1996, which it did not.

Ct. 2382, 72 L. Ed. 2d 786 (1982); *Rinaldi v. Yeager*, 384 U.S. 305, 309-10, 86 S.
Ct. 1497, 16 L. Ed. 2d 577 (1966).  But neither DOMA Section 3 nor Section 101
does these things.  When Congress declines to extend benefits to those not
previously eligible, the Supreme Court has recognized that this is justified by the
government interest in proceeding "cautiously" and protecting the fisc.  *Bowen*,
476 U.S. at 348 ("A constitutional rule that would invalidate Congress'[s] attempts
to proceed cautiously in awarding increased benefits might deter Congress from
making any increases at all.  The Due Process Clause does not impose any such
constitutional straitjacket." (citation and quotation marks omitted)).

Additionally, in enacting DOMA, Congress recognized that a host of pre-existing federal statutes allocated marital burdens and benefits based on the
traditional definition of marriage – because there had never been any other
definition.  The Congresses that enacted these programs therefore reached
legislative judgments exclusively with opposite-sex couples in mind.  *See, e.g.*, H.
Rep. No. 94-601, at 2 (1975) (recognizing prior system of veterans' benefits
available "to the veteran with a wife and children").  It was reasonable for the
Congress that enacted DOMA to preserve those legislative judgments and to allow
those programs to operate in the manner initially intended.  In the context of
federal regulation and spending, that is surely a rational basis.

### 3. Caution in Facing the Unknown Consequences of a Novel Redefinition of a Foundational Social Institution.

Marriage is the Nation's most important social institution and one of the
foundations of our society.  *See* 150 Cong. Rec. 15347 (2004) (Sen. Clinton)
(marriage is "the fundamental bedrock principle that exists between a man and a
woman, going back into the mi[]st of history as one of the foundational institutions
of history and humanity and civilization").  Accordingly, in enacting DOMA
Section 3 and Section 101, Congress had a supremely rational basis to proceed
with caution in considering whether to drop a criterion – opposite-sex couples –

13

that until now has been an essential element of such an enormously important social concept as marriage.  *See* House Opp'n at 3-4.

In enacting DOMA, Congress reasonably could have compared the ancient and well-established benefits of traditional marriage with the near complete lack of information about the consequences of recognizing same-sex marriages and concluded that an insufficient basis had been established to support such a major and unprecedented redefinition of such an important institution.[8]  As two supporters of same-sex marriage put it, "whether same-sex marriage would prove socially beneficial, socially harmful, or trivial is an empirical question . . . .  There are plausible arguments on all sides of the issue, and as yet there is no evidence sufficient to settle them."  William Meezan & Jonathan Rauch, *Gay Marriage, Same-Sex Parenting, and America's Children*, 15 Future of Children 97, 110 (Fall 2005), http://futureofchildren.org/futureofchildren/publications/docs/15_02_06.pdf (endorsing "limited, localized experiment" at state level).  Particularly in light of the traditional role of states serving as "laborator[ies] … [of] novel social and economic experiments without risk to the rest of the country," *New State Ice Co. v. Liebmann*, 285 U.S. 262, 309, 52 S. Ct. 371, 76 L. Ed. 747 (1932) (Brandeis, J., dissenting), Congress rationally could decide to let states experiment, while the

_____

[8]  *See, e.g.*, 150 Cong. Rec. 4684 (2004) (Sen. Cornyn) ("The institution of marriage is just too important to leave to chance . . . .  The burden of proof is on those who seek to experiment with traditional marriage, an institution that has sustained society for countless generations."); *id.* 14942 (Sen. Hatch) ("The jury is out on what the effects on children and society will be . . . .  [G]iven the uncertainty of a radical change in a fundamental institution like marriage, popular representatives should be given deference on this issue."); *id.* 14949 (Sen. Frist) ("a vast untested social experiment for which children will bear the ultimate consequences"); *id.* 14951 (Sen. Sessions) ("I think anybody ought to be reluctant to up and change [the traditional definition of marriage]; to come along and say, well, you know, everybody has been doing this for 2000 years, but we think we ought to try something different."); *id.* 15444  (Sen. Smith) (expressing reluctance to "tinker[] with the foundations of our culture, our civilization, our Nation, and our future"); 152 Cong. Rec. 10058 (2006) (Sen. Talent) ("[T]he evidence is not even close to showing that we can feel comfortable making a fundamental change in how we define marriage so as to include same-sex marriage within the definition.").

federal government continued to apply the traditional definition for federal law purposes.  Congress's decision neither to attempt to override state law definitions for state purposes nor to adopt novel re-definitions for purposes of federal law surely is a rational response to a change in the definition of a foundational institution.

Plaintiffs implausibly state that DOMA Section 3 and Section 101 "do[] not preserve the status quo" because by enacting them Congress declined to adopt state-law marital determinations in some cases. Pls.' Mem. at 23-25.  Even if that were indeed what Congress always had done in the past – and it emphatically was not, *see* House Opp'n at 3-4 (noting Congress's long history of defining marital terms in federal law) – there is no dispute that, when the statutes were enacted, no same-sex couples were eligible for federal marital benefits.  DOMA plainly preserved the status quo of the traditional understanding of marriage.  Plaintiffs would like Congress to have preferred preserving a choice-of-law rule over preserving our fundamental social institution, but such an approach is the antithesis of rational basis review.

To be sure, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees, but there is far more here than simply historical patterns." *Marsh v. Chambers*, 463 U.S. 783, 790, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983).  In considering the definition of marriage, Congress recognized that marriage between man and woman "is deeply embedded in the history and tradition of this country," and "has become part of the fabric of our society," in a way that has produced countless immeasurable benefits. *Id.* at 786, 792.  DOMA Section 3 thus was born not of a reflexive adherence to tradition but of an appreciation for these vast benefits and a reluctance to change the institution of marriage in a way that would have unpredictable consequences for them. *See Lawrence v. Texas*, 539 U.S. 558, 585, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003)

15

(O'Connor, J., concurring) ("preserving the traditional institution of marriage" is rational basis for "laws distinguishing between heterosexuals and homosexuals").

### B.    Common Federal-State Interests:  Congress Rationally Sought to Encourage Responsible Procreation.

In addition to these uniquely federal rational bases, DOMA Section 3 and Section 101 also are supported by the rational bases that justified the states' adoption of the traditional definition of marriage in the first place.  Congress would not have needed to engage in any fact-finding of its own to come to this conclusion:  At DOMA Section 3's and Section 101's respective enactments, no state recognized same-sex marriage, and even now the great majority of states recognize only opposite-sex marriages.  *See* House Opp'n at 5, 23.  Congress rationally could have adopted this majority state approach as reasonable and appropriate for federal use.  Accordingly, this section enumerates some of the rational bases that underlie the decisions made by the great majority of states, and that thus also support Congress's enactment of DOMA Section 3 and Section 101.

The traditional definition of marriage recognizes the close relationship between opposite-sex marriages and child-rearing.  Until recent scientific advances, children could be conceived only though the union of one woman and one man, and this remains the nearly exclusive means by which new lives are brought into existence.  Likewise, "[u]ntil a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex." *Hernandez v. Robles*, 855 N.E.2d 1, 8, 821 N.Y.S.2d 770 (N.Y. 2006).  Although marriage fills other functions as well, its defining purpose is the creation of a social structure to deal with the inherently procreative nature of the male-female relationship – the word "matrimony" itself implicates parenthood.  Marriage attempts to promote permanence and stability, which promote the welfare of the children.

Congress specifically recognized this purpose in enacting DOMA Section 3, noting that, "[s]imply put, government has an interest in marriage because it has an interest in children." House Rep. at 13. This accords with the long tradition of our law, recognizing the tie between marriage and children.[9] Opposite-sex relationships have inherent procreative aspects that can produce unplanned offspring. For this reason, heterosexual relationships implicate the state interest in responsible procreation in a different way, and to a different degree, than do homosexual relationships, and therefore rationally may be treated differently by the government. Numerous courts have upheld states' traditional marriage laws on this basis.[10] Foreign governments have expressed the same view.[11]

### 1. Traditional Marriage Provisions Rationally Focus on Opposite-Sex Couples in Subsidizing the Begetting and Raising of Children.

Opposite-sex relationships are unique in their inherent biological tendency to produce children: Opposite-sex couples can, and frequently do, conceive children regardless of their intentions or plans. The government thus has an interest in channeling potentially procreative heterosexual activity into the stable, permanent

---

[9] *E.g.*, 1 William Blackstone, Commentaries on the Laws of England *447 (citing Puffendorf that "[t]he duty of parents to provide for the maintenance of their children[] is a principle of natural law"; citing Montesquieu for the proposition "that the establishment of marriage in all civilized states is built on this natural obligation"); *id*. *455 ("the main end of marriage" is "the protection of infants"); Institute for American Values, *Marriage and the Law: A Statement of Principles* 6, 18 (2006) (large group of family and legal scholars who "do not all agree substantively on . . . whether the legal definition of marriage should be altered to include same-gender couples," stating that "[m]arriage and family law is fundamentally oriented towards creating and protecting the next generation"). California law reflects the same principle. *Aufort v. Aufort*, 49 P.2d 620, 621, 9 Cal. App. 2d 310 (Cal. Dist. Ct. App. 1935) ("[P]rocreation of children is the most important end of matrimony . . . .").

[10] *See Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 867-68 (8th Cir. 2006); *Conaway v. Deane*, 932 A.2d 571, 630-31, 401 Md. 219 (Md. 2007); *Andersen v. King Cnty.*, 138 P.3d 963, 982-83, 158 Wash. 2d 1 (Wash. 2006).

[11] *E.g.*, *Schalk & Kopf v. Austria* ¶¶ 44, 63, No. 30141/04 E.U. Ct. H. R. 2010, *available at* http://archive.equal-jus.eu/109/1/Schalk_and_Kopf.pdf; *Joslin v. New Zealand* ¶¶ 3.2, 8.2, 8.3, No. 902/1999 H.R. Comm. 2002, *in* 2 Report of the Human Rights Comm., U.N. Doc. A/57/40, 214 (2002).

structure of marriage, for the sake of the children, especially unplanned children, that may result.  Moreover, when a heterosexual relationship between unmarried individuals produces unplanned offspring, the government has an interest in encouraging marriage to provide a stable environment for the raising of children.  Same-sex couples simply do not present this concern.

Only a tiny fraction of all children are raised in households headed by same-sex couples.[12]  Similarly, opposite-sex couples continue to raise children in significantly greater proportions than same-sex couples.[13]  And, in all events, same-sex couples certainly do not present the same issues with respect to unplanned pregnancies.  Thus, the government rationally can limit an institution designed to facilitate child-rearing to relationships in which the vast majority of children are raised and which implicate unique concerns about unplanned pregnancies.  Notably, the rationality of this interest can be determined without inquiring whether the traditional mother-father childrearing arrangement is in any sense "better" than any other.  Therefore, while government may and does recognize other relationships in more limited fashions, Congress rationally chose to apply a special set of benefits and duties to traditional marriages.

Plaintiffs' observation that opposite-sex couples are not required to (or in some cases cannot) procreate does not change any of this.  Pls.' Mem. at 19.

---

[12]  UCLA's Williams Institute estimates that, "[a]s of 2005, . . . 270,313 of the U.S.'s children are living in households headed by same-sex couples," Adam P. Romero et al., *Census Snapshot* 2 (Dec. 2007), http://escholarship.org/uc/item/6nx232r4, or 0.37% of the 73,494,000 children in the United States that year, *see Living Arrangements of Children Under 18 Years Old:  1960 to Present*, U.S. Census Bureau, *available at* http://www.census.gov/hhes/families/data/children.html (download "Table CH-1") (number of children).

[13]  2010 Census data indicate that only one in six same-sex couples are raising children. Daphne Lofquist et al., *Housholds and Families: 2010*, Census Br. C2010BR-14, tbl. 3 (Apr. 2012) (*see* "Same-sex partner preferred estimates" data), *available at* http://www.census.gov/prod/cen2010/briefs/c2010br-14.pdf.  This compares with the approximately 40% of opposite-sex couples (both married and unmarried) raising children.  *Id.* ("Husband-wife households" and "Opposite-sex partner" data).

18

Because only a man and a woman can beget a child together, making those same parties the only ones eligible for marriage is a rational way of linking procreation and marriage.  *Cf. Tuan Anh Nguyen v. INS*, 533 U.S. 53, 70, 121 S. Ct. 2053, 150 L. Ed. 2d 115 (2001) (even under heightened scrutiny, where statute classifies based on genuine biological difference, courts have not "required that the statute . . . be capable of achieving its ultimate objective in every instance").  This is particularly true where most opposite-sex couples' ability and willingness to raise children cannot be determined in advance without intolerable and possibly unconstitutional intrusions on their privacy – and even then could not be determined with much reliability in many cases.  And surely the government's acceptance of unmarried parents does not make it irrational for it to *encourage* parents to marry.

### 2. Traditional Marriage Provisions Rationally Encourage and Subsidize the Raising of Children by Their Own Biological Mothers and Fathers.

One of the strongest presumptions known to our culture and law is that a child's biological mother and father are the child's natural and most suitable guardians and caregivers, and that this family relationship will not lightly be disrupted.  *E.g.*, *Santosky v. Kramer*, 455 U.S. 745, 760 n.11, 766, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).[14]  Our tradition offers the same protections for an adoptive parent-child relationship, once it is formed – but the stringent standards imposed for eligibility to adopt, which never would be required as a condition of custody of one's own biological offspring, demonstrate the unique value we place on the biological parent-child relationship.  *See, e.g.*, *Mullins v. Oregon*, 57 F.3d 789, 794 (9th Cir. 1995) (no fundamental liberty interest in adopting child); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)

---

[14]  International law recognizes the same principle.  *See* United Nations Convention on the Rights of the Child, art. 7, 28 I.L.M. 1456, 1460 (Nov. 20, 1989) (child has right, "as far as possible, . . . to know and be cared for by his or her parents").

(noting protected interest of "a man in the children he has sired and raised").  And there is a sound logical basis for this bedrock assumption:  Biological parents have a genetic stake in the success of their children that no one else does.

It is rational for government to encourage relationships that result in mothers and fathers jointly raising their biological children.  By offering benefits to opposite-sex couples in enacting DOMA, and imposing the marital expectations of fidelity, longevity, and mutual support, that is what Congress did.  Because same-sex relationships are incapable of creating families of mother, father, and biological children, the legitimate state interest in promoting a family structure that facilitates the rearing of children by both biological parents is distinctively served by the traditional definition.

Plaintiffs contend, in cursory fashion, that parenting by same-sex couples is interchangeable with parenting by a child's biological mother and father.  Pls.' Mem. at 19-20.  But this proposition is, to say the least, far from so clear that it would be irrational for Congress to disagree.  Plaintiffs purport to rely on social-science research.  But the state of this research was well summarized by two self-described supporters of same-sex marriage in 2005:  "[T]hose who say the evidence shows that many same-sex parents do an excellent job of parenting are right.  Those who say the evidence falls short of showing that same-sex parenting is equivalent to opposite-sex parenting (or better, or worse) are also right." Meezan & Rauch, *supra* p. 14, at 104; *cf. Hernandez*, 855 N.E. 2d at 8 ("What [the studies] show, at most, is that rather limited observation has detected no marked differences.").  This simple fact reinforces the Supreme Court's observation that "proving broad sociological propositions by statistics is a dubious business," *Craig v. Boren*, 429 U.S. 190, 204, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) – especially when the proposition challenges the rationality of one of the organizing principles of our society, and would set up social science as the final arbiter of what it means to raise a child "well."

### 3. Traditional Marriage Provisions Rationally Encourage Childrearing in a Setting with Both a Mother and a Father.

Even aside from the biological link between parents and children, biological differentiation in the roles of mothers and fathers makes it fully rational to encourage family situations that allow children to have one of each – a role model of each gender. As the Supreme Court recognizes in other contexts, "[t]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *United States v. Virginia*, 518 U.S. 515, 533, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) (quoting *Ballard v. United States*, 329 U.S. 187, 193, 67 S. Ct. 261, 91 L. Ed. 181 (1946) (brackets omitted)).

### 4. Allegations of "Animus" Cannot Invalidate Traditional Marriage Provisions.

Contrary to Plaintiffs' suggestions, "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968). Thus, while the Supreme Court has of course recognized that discrimination purely for its own sake is not a rational basis for a law, under the established approach, constitutional review does not require a separate judicial inquiry into whether a law was motivated by "animus." Instead, only *after* no other rational basis for a law can be found will the courts conclude that impermissible animus must have been the motivation. *See Romer v. Evans*, 517 U.S. 620, 635, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996) ("Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-447, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) ("[S]ome objectives – such as a bare . . . desire to harm a politically unpopular group – are not legitimate state interests." (citation and quotation marks omitted); *USDA v. Moreno*, 413 U.S. 528, 534, 93 S. Ct. 2871, 37 L. Ed. 2d 782 (1973) ("[A] bare congressional desire to harm a politically unpopular group

21

cannot constitute a *legitimate* governmental interest." (emphasis added)).  Indeed, the means by which the courts have always "ensure[d] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law" is precisely "[b]y requiring that the classification bear a rational relationship to an independent and legitimate legislative end." *Romer*, 517 U.S. at 633.  Thus, as the House has identified numerous rational bases for DOMA, that ends the inquiry here.

In any event, many applications of DOMA benefit same-sex couples who obtain state marriage licenses, by exempting them from federal marriage penalties or other duties.  This is not the hallmark of an enactment meant simply to harm an unpopular group, but rather of a legislative attempt to sort things based on real differences perceived by the legislature – which, by definition, satisfies rational basis review.

## V.    The Democratic Process Should Be Used to Redefine Marriage.

When it comes to same-sex marriage, "it is difficult to imagine an area more fraught with sensitive social policy considerations in which federal courts should not involve themselves if there is an alternative." *Smelt v. Cnty. of Orange*, 447 F.3d 673, 681 (9th Cir. 2006).  Fortunately, there is an alternative:  Same-sex marriage is being actively debated in legislatures, in the press, and at every level of government and society across the country and currently in the Supreme Court.  That is how it should be and this Court should "permit[] this debate to continue, as it should in a democratic society." *Washington v. Glucksberg*, 521 U.S. 702, 735, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997).

# CONCLUSION

For all the foregoing reasons, the Court should grant the House's Cross Motion for Summary Judgment.

Respectfully submitted,

By: */s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci
BANCROFT PLLC[15]

*Counsel for Intervenor-Defendant the Bipartisan Legal Advisory Group of the U.S. House of Representatives*[16]

March 18, 2013

---

[15]   Kerry W. Kircher, as ECF filer of this document, attests that concurrence in the filing of the document has been obtained from signatory H. Christopher Bartolomucci.

[16]   The Bipartisan Legal Advisory Group, which speaks for the House in litigation matters, currently is comprised of the Honorable John A. Boehner, Speaker of the House, the Honorable Eric Cantor, Majority Leader, the Honorable Kevin McCarthy, Majority Whip, the Honorable Nancy Pelosi, Democratic Leader, and the Honorable Steny H. Hoyer, Democratic Whip.  The Democratic Leader and Democratic Whip decline to support the filing of this motion.

**CERTIFICATE OF SERVICE**

I certify that on March 18, 2013, I electronically filed the foregoing Memorandum of Points and Authorities In Support of Cross Motion of Intervenor-Defendant for Summary Judgment with the Clerk of Court by using the CM/ECF system, which provided an electronic notice and electronic link of the same to the following attorneys of record through the Court's CM/ECF system:

> Caren E. Short, Esquire
> Christine P. Sun, Esquire
> Joseph J. Levin, Jr., Esquire
> SOUTHERN POVERTY LAW CENTER
> 400 Washington Avenue
> Montgomery, Alabama  36104
> caren.short@splcenter.org
> christine.sun@splcenter.org
> joe.levin@splcenter.org
> *Counsel for Plaintiffs*

> Adam P. Romero, Esquire
> Rubina Ali, Esquire
> WILMER CUTLER PICKERING HALE & DORR LLP
> 7 World Trade Center
> New York City, New York  10007
> adam.romero@wilmerhale.com
> rubina.ali@wilmerhale.com
> *Counsel for Plaintiffs*

> Eugene Marder, Esquire
> WILMER CUTLER PICKERING HALE & DORR LLP
> 950 Page Mill Road
> Palo Alto, California  94304
> eugene.marder@wilmerhale.com
> *Counsel for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Randall R. Lee, Esquire
Matthew D. Benedetto, Esquire
WILMER CUTLER PICKERING HALE & DORR LLP
350 South Grand Avenue Suite 2100
Los Angeles, California  90071
randall.lee@wilmerhale.com
matthew.benedetto@wilmerhale.com
*Counsel for Plaintiffs*

Jean Lin, Senior Trial Counsel
U.S. DEPARTMENT OF JUSTICE
Civil Division - Federal Programs Branch
20 Massachusetts Avenue, Northwest
Washington, District of Columbia  20530
jean.lin@usdoj.gov
*Counsel for Executive Branch Defendants*

*/s/ Kerry W. Kircher*
Kerry W. Kircher