# **EXHIBIT E**

# In The Matter Of:

## *EDITH SCHLAIN WINDSOR*
## *v.*
## *THE UNITED STATES OF AMERICA*

_____

## *NANCY F. COTT, PH.D. - Vol. 1*
### *July 6, 2011*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

```
09:52:19   1    together.
09:52:24   2        Q   I think you talked about the pair, in your
09:52:31   3    previous answer.  Did that pair ever include same-sex
09:52:36   4    couples?
09:52:36   5        A   Not to my knowledge, in the colonial part of
09:52:41   6    the -- part of North America or at the time of the
09:52:44   7    founding among those who consider themselves part of the
09:52:47   8    new United States.
09:52:47   9        Q   Has marriage been a national or federal issue
09:53:02  10    at times during American history?
09:53:05  11            MR. EHRLICH:  Objection to the form.  Vague and
09:53:08  12    ambiguous.
09:53:08  13            You can answer.
09:53:10  14        A   You said a national or a --
09:53:13  15        Q   Let me rephrase.
09:53:15  16            Has marriage been an issue of federal law at
09:53:17  17    times during American history?
09:53:19  18        A   Yes, marriage in federal territories.
09:53:23  19        Q   What about marriage among native Americans?
09:53:29  20        A   Yes, that's a good point, that in dealing with
09:53:34  21    Indians, again, in federal territories and in certain
09:53:43  22    states where the federal government was dealing with
09:53:51  23    the -- with native Americans through the Bureau of
09:53:56  24    Indian Affairs, the form of marriage observed by these
09:53:59  25    populations was of concern to that federal agency, yes,
```

Page 18

09:54:04  1   and to certain people in congress.
09:54:05  2       Q   In the post civil war era, did the federal
09:54:12  3   government involve itself in the question of the
09:54:15  4   marriage between former slaves?
09:54:17  5       A   During the civil war when the South was
09:54:21  6   occupied and in the very beginning of the post civil war
09:54:25  7   period when the southern states were not yet
09:54:28  8   reconstituted, yes, the federal government through the
09:54:32  9   Freedmen's Bureau concerned itself with marriages of the
09:54:36  10  freed men and women.
09:54:37  11      Q   I'd like you to turn to Paragraph 13, page 5 of
09:54:55  12  Exhibit 2.  This is your expert affidavit.
09:54:59  13      A   I'm sorry.  I didn't catch which page.
09:55:00  14      Q   Page 5, Paragraph 13, right under Section B.
09:55:05  15      A   Okay.
09:55:07  16      Q   You write there, "What is seen as legitimate
09:55:11  17  marriage in a given society may be, for instance,
09:55:14  18  polygamous, monogamous, matrifocal or patrifocal,
09:55:19  19  patrilineal or matrilineal, lifelong or temporary, open
09:55:21  20  or closed to concubinage, divorce-prone or
09:55:25  21  divorce-averse," and so on.
09:55:26  22          Are you an expert in marriage and world
09:55:29  23  cultures?
09:55:30  24      A   As I said at the outset, I am a specialist in
09:55:34  25  the history of the United States, but that is studied in

```
10:15:59   1    where did the norm come from?
10:16:00   2        A    Both from religious, i.e., Christian, sets of
10:16:07   3    belief and from political theories that were built with
10:16:13   4    that belief system as their base, although, again, that
10:16:19   5    deals with settler populations and not with native
10:16:22   6    Americans in that geographical range.
10:16:26   7        Q    Would you turn to Paragraph 74 on page 18.  In
10:16:39   8    the first sentence you write, "The U.S. Congress has
10:16:41   9    involved itself directly in making or breaking marriages
10:16:44  10    only in exceptional situations."
10:16:49  11             What do you mean by "exceptional situations" in
10:16:55  12    this line?
10:16:55  13        A    I mean situations in which state governments
10:16:58  14    were not functioning, since state governments have
10:17:02  15    historically had jurisdiction over making and breaking
10:17:05  16    marriages.
10:17:05  17        Q    And what have those exceptional situations been
10:17:10  18    where the federal government -- excuse me -- the
10:17:13  19    U.S. Congress has involved itself directly in marriage?
10:17:15  20        A    First of all, in the federal territories where
10:17:20  21    congress has primary power; and secondly, as I describe
10:17:25  22    here, in the period of the civil war and immediately
10:17:33  23    after when areas that had been states were -- their
10:17:39  24    state governments were crushed and not yet really
10:17:43  25    assembled.
```

Page 32

```
10:17:44   1         Q    Turn to Paragraph 79, page 19 of Exhibit 2.
10:18:13   2    You write, Dr. Cott, "Congress acted not only because
10:18:16   3    the presence of polygamy on the North American continent
10:18:20   4    seemed loathsome but because Utah's intent to apply for
10:18:24   5    statehood loomed on the horizon."
10:18:25   6              What do you mean by "loathsome"?
10:18:27   7         A    There was with an American political theory
10:18:34   8    since the founding, an opposition understood between
10:18:37   9    monogony and polygamy that aligned with the difference
10:18:41  10    between a government of laws in alignment with monogony
10:18:52  11    and a despotic government, which to American founders
10:18:56  12    and many Americans through the 19th century aligned with
10:18:59  13    polygamy.  So that polygamy was not only foreign to
10:19:04  14    their religious beliefs of Christianity but also foreign
10:19:09  15    to their political intents.
10:19:16  16         Q    If one finds something loathsome, does she
10:19:19  17    demonstrate an animus towards the things she finds
10:19:22  18    loathsome?
10:19:22  19              MR. EHRLICH:  Objection to the form.  Vague as
10:19:27  20    to "animus."
10:19:27  21              You can answer.
10:19:28  22         A    Well, I don't understand why "animus" as a word
10:19:33  23    is so important to you in this question, but I would say
10:19:36  24    that just using the word as I do, yes, that 19th century
10:19:40  25    Americans in general and certainly members of congress
```

```
10:19:45   1    who are involved in this action and a series of
10:19:49   2    presidents exhibited great animus against polygamy.
10:19:57   3    They associated it with barbarism.  That was the word
10:20:02   4    most used to describe polygamy.
10:20:05   5         Q    And as a historical matter, congress had the
10:20:15   6    power to ban polygamy, correct?
10:20:17   7         A    Only in the territories.
10:20:23   8         Q    And in Paragraph 78 right above the last
10:20:43   9    paragraph we were looking at, you say that bigamy was a
10:20:46  10    crime in every state.  Is it fair to say that polygamy
10:20:52  11    was an exceptional situation because it departed from
10:20:54  12    the understanding of monogony that Americans had
10:20:58  13    embraced?
10:20:59  14              MR. EHRLICH:  Objection to the form.
10:21:01  15         A    I don't understand the question.  Polygamy was
10:21:04  16    an exceptional situation?  Whose polygamy?
10:21:08  17         Q    Well, you write that "U.S. Congress has
10:21:10  18    involved itself directly in making or breaking marriages
10:21:12  19    only in exceptional situations."
10:21:14  20              What made polygamy an exceptional situation?
10:21:17  21              MR. EHRLICH:  Objection to the form.  I think
10:21:18  22    she already described exceptional situations, and it
10:21:21  23    didn't relate to polygamy.
10:21:22  24              But you can answer.
10:21:23  25         A    Well, I mean, exceptional in the general course
```

**Name of Cases:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDITH SCHLAIN WINDSOR,
in her capacity as Executor of the Estate of THEA CLARA SPYER,
Plaintiff,

v.

THE UNITED STATES OF AMERICA,
Defendant.

(10 Civ. 8435) (BSJ) (JCF)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOANNE PEDERSEN & ANN MEITZEN, GERALD V. PASSARO II, LYNDA DEFORGE & RAQUEL ARDIN, JANET GELLER & JOANNE MARQUIS, SUZANNE & GERALDINE ARTIS, BRADLEY KLEINERMAN & JAMES GEHRE, and DAMON SAVOY & JOHN WEISS,
Plaintiffs,

v.

OFFICE OF PERSONNEL MANAGEMENT, TIMOTHY F. GEITHNER, in his official capacity as the Secretary of the Treasury, and HILDA L. SOLIS, in her official capacity as the Secretary of Labor, MICHAEL J. ASTRUE, in his official capacity as the Commissioner of the Social Security Administration, UNITED STATES POSTAL SERVICE, JOHN E. POTTER, in his official capacity as The Postmaster General of the United States of America, DOUGLAS H. SHULMAN, in his official capacity as the Commissioner of Internal Revenue, ERIC H. HOLDER, JR., in his official capacity as United States Attorney General, JOHN WALSH, in his official capacity as Acting Comptroller of the Currency, and THE UNITED STATES OF AMERICA,
Defendants.

(310-CV-1750) (VLB)

**Date of Deposition:**  Wednesday, July 6, 2011

**Name of Witness:**  Nancy F. Cott, Ph.D.

Nancy Cott Errata Sheet for July 6, 2011 Deposition

I wish to make the following changes, for the following reasons:

PAGE LINE: 7:7
CHANGE FROM: "disciplines in history"
CHANGE TO: "disciplines than history"
REASON: Transcription error


PAGE LINE: 9:4
CHANGE FROM: "Federalism"
CHANGE TO: "federalism"
REASON: Typographical error


PAGE LINE: 11:17
CHANGE FROM: "It may"
CHANGE TO: "These may"
REASON: Transcription error


PAGE LINE: 11:21–22
CHANGE FROM: "the church, or various churches and individuals"
CHANGE TO: "the church (or various churches), and individuals"
REASON: Typographial error


PAGE LINE: 11:24
CHANGE FROM: "marriage is or central purpose is."
CHANGE TO: "marriage is."
REASON: Transcription error

Nancy Cott Errata Sheet for July 6, 2011 Deposition

| | |
|---|---|
| PAGE LINE: | 15:10 |
| CHANGE FROM: | "consanguine." |
| CHANGE TO: | "consanguinity." |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 15:15–17 |
| CHANGE FROM: | "I would say that there are certain native American societies in which such a pairing would have been accepted and considered customary." |
| CHANGE TO: | "I would say that there are certain native American societies in which such a pairing [a couple of the same-sex] would have been accepted and considered customary." |
| REASON: | Clarification |

| | |
|---|---|
| PAGE LINE: | 16:17 |
| CHANGE FROM: | "what essentials are." |
| CHANGE TO: | "what the essentials are." |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 18:22 |
| CHANGE FROM: | "marriage and world" |
| CHANGE TO: | "marriage in world" |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 26:6–7 |
| CHANGE FROM: | "The husband was assumed just to take one major differentiation, to be" |

3

Nancy Cott Errata Sheet for July 6, 2011 Deposition

| | |
|---|---|
| CHANGE TO: | "The husband was assumed (just to take one major differentiation) to be" |
| REASON: | Typographical error |

| | |
|---|---|
| PAGE LINE: | 27:17, 24, 25 |
| CHANGE FROM: | "complimentary" |
| CHANGE TO: | "complementary" |
| REASON: | Typographical error |

| | |
|---|---|
| PAGE LINE: | 28:9 |
| CHANGE FROM: | "be" |
| CHANGE TO: | "been" |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 28:3, 9, 11, 18, 20, 22; 29:6, 11, 14, 15, 23; 30:4, 18; 32:9, 10 |
| CHANGE FROM: | "monogony" |
| CHANGE TO: | "monogamy" |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 35:3 |
| CHANGE FROM: | "historians, that" |
| CHANGE TO: | "historians, about" |
| REASON: | Transcription error |

4

Nancy Cott Errata Sheet for July 6, 2011 Deposition

| | |
|---|---|
| PAGE LINE: | 35:4 |
| CHANGE FROM: | "polygamy really" |
| CHANGE TO: | "polygamy, which really" |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 35:20 |
| CHANGE FROM: | "fight, but" |
| CHANGE TO: | "fight, that" |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 37:4 |
| CHANGE FROM: | "monogamist's" |
| CHANGE TO: | "monogamous" |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 44:21 |
| CHANGE FROM: | "succession" |
| CHANGE TO: | "secession" |
| REASON: | Transcription error |

| | |
|---|---|
| PAGE LINE: | 44:23 |
| CHANGE FROM: | "cessation" |
| CHANGE TO: | "secession" |
| REASON: | Transcription error |

Nancy Cott Errata Sheet for July 6, 2011 Deposition

PAGE LINE: 54:25

CHANGE FROM: "triable"

CHANGE TO: "tribal"

REASON: Transcription error


PAGE LINE: 60:6

CHANGE FROM: "state the jurisdiction"

CHANGE TO: "state jurisdiction"

REASON: Transcription error


PAGE LINE: 60:10

CHANGE FROM: "authorities"

CHANGE TO: "authority"

REASON: Transcription error

Nancy Cott Errata Sheet for July 6, 2011 Deposition

*Nancy F. Cott*

Nancy F. Cott, Ph.D

Subscribed and sworn to before me

this ___3___ day of August, 2011.

(NOTARY PUBLIC)

9·3·15

(MY COMMISSION EXPIRES)

CERTIFICATE

STATE OF _Massachusetts_

: ss.

COUNTY OF _Middlesex_



LINDSAY EUZUKONIS
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
September 03, 2015

7